Good morning, Your Honor. Good morning. Mark Vanderhout appearing. Stacey Tolchin from my office on behalf of Mr. López-Urenda, who is president of court with two of his three United States citizen children and his coworkers at Phil Bloom, who have been trying for five years now to obtain permanent residency for him. This case is about whether Mr. López-Urenda, who has been a model resident of this country for 16 years now, can be permanently separated from his three United States citizen children and the job which he has had for many years at Phil Bloom. When the government's three-year delay, over three-year delay, in adjudicating his application for permanent residency, the labor certification which leads to that, caused him to be unable to file his motion to reopen, to renew his application for permanent residency in what the government asserts is a timely fashion. There are three possible issues for this Court to consider. The first is whether the BIA erred in holding that the motion to reopen for adjustment must be denied because the overstate is voluntary departure period. And this issue involves the issue that was left undecided, specifically reserved in the Court's decision in Garcia, and whether the contrarist or a gun rule that this Court established that says voluntary departure stays in effect and remains pending throughout the period of the Court's litigation. Do you have jurisdiction to reach that issue? Do you have jurisdiction? Yes, Your Honor. That was left specifically decided, undecided by. No, no, no. I don't mean the question's been answered. I mean, do we have jurisdiction in this case to reach that issue? Yes, you do, Your Honor. That was raised from the beginning. Because the BIA's declining sua sponte reopening is not reviewable. Okay. That's the third issue, Your Honor. What I'm raising now does not involve the sua sponte reopening. We have three arguments. If I can explain why. There's three – there's two bases for the Court when the Board denied the motion to reopen. One is that he was – overstayed his voluntary departure. And that's the issue I'm addressing now. And we believe the Court's decision in contrarist or a gun controls that. I understand. Maybe I'm not being very clear. In fact, I'm sure I'm not. But this all comes about in the context of whether the BIA should have sua sponte decided to reopen. No. Let me explain why. I'm sorry. Do you mind? And that is not a reviewable decision. As to that, that is not reviewable. If they had made the determination and said, no, we're going to decline to reopen in the exercise of our discretion because we don't think there's exceptional circumstances here, that – Which they did. No, they didn't, Your Honor. They entirely did not address that issue at all. And we brief that. And the Court's decision in Sadat Gok – I'm not pronouncing that possibly, which she submitted in the 28-J letter – says specifically, even if the Court doesn't have jurisdiction to review the determination, when the Board doesn't address it at all, then it must remand for the Board to do so. And the Board does not here address the issue of whether they're going to exercise discretion and sua sponte reopen or not. They say he's ineligible under the statute for two reasons. They never address whether, despite that, which they can. They say it wasn't timely, and then they say, moreover or furthermore, we find, which is an alternative throwaway. Correct. That he's barred. Yeah. Because he didn't file in a timely fashion. There's two different reasons, and those are both statutory bars, overstaying voluntary departure and not filing within 90 days. But they don't address at all the third issue, which is that they had the power to, notwithstanding that, to sua sponte reopen the case on their own under exceptional circumstances we asserted in the motion to open existed. They entirely did not address that issue. Not one word about that. And this Court's decision in Sagadiac says that, although there's no jurisdiction, if the Board does address it to overturn that, when the Board doesn't even address it, the Court has to remand it for the Board to do so. And so ---- Excuse me. Go ahead and finish with your ---- I'm sorry. Go ahead and finish with your response to the trial. I'm finished on that point, Your Honor. Okay. Go ahead. You asked them to sua sponte reopen, did you not? We did two things. We asked them to sua sponte in the alternative, but we said that he was ---- Now, your question, my question is answered by simply saying yes. You asked them, did you not? Yes. All right. Now, does it make any difference whether you ask them in response or as to their duty to decide whether to spontaneously or sua sponte reopen? Does it make any difference whether or not you ask? Well, they ---- I guess they could on their own decide to reopen. That's true. They have the power to do it even if you don't ask. But when you do ask ---- Well, you think it makes a difference? I think for this Court, yes, it makes a difference. In other words, the Board could have done it, but we would assert there's no error by the Board if they don't address it. If you ask them to do it, then how can it be sua sponte? Because under the regulation, under the regulation 1003.2a, the Board cannot, withstanding the fact that it's beyond 90 days or any other reason, the Board can decide for exceptional circumstances to reopen the case. And we asked the Board to do that. And under the Sagajek decision, even though it is discretionary and the Court couldn't reverse it if the Board had addressed the issue, because the Board did not address the issue, it has to be remanded for them to do so. What I'd like to do ---- Well, why would it ---- I'm sorry. Why wouldn't it have to touch upon the issue even if you never asked? What difference does it make if we're talking about some duty of the Board to resolve this kind of an issue? Because you are now explaining. The Court has never held that the Board has to address issues that are not presented to it. What it has addressed is that if the issues are presented to it, it must address those issues. It can't entirely fail to address them at all. And that's the difference. But we don't even have to get to that issue because there are two grounds that the Board denied as specific to the statute. One is the overstayed 30-day voluntary departure period the Board put into effect. And the other is that it didn't file within 90 days. Both of those are overcome, separate apart from the sui sponte reopening issue, because under this Court's decision in Contreras-Aragon, which we believe has to be held to apply to people who filed under Contreras-Aragon under this Court's en banc decision in George v. Camacho, which said you can only apply such changes prospectively, that the overstaying of voluntary departure can't be applied to him. We also believe, and we set this forth in our briefing, that the failure to file within 90 days of the Board's decision to fail to file his motion to reopen was the fault of the government. The government took three years to adjudicate his labor certification application of permanent residency. It was that three-year delay that caused him not to be able to file in a timely file. We've cited many cases to this Court where this Court and many other courts have said when the government's delay causes someone to become ineligible under the statute, it would be fundamentally unfair and a violation of due process to say, well, sorry, too bad. Yeah, we took this long, but now we're going to say too bad to you. You're out of luck. Can I ask you, because you're running out of time and I want to focus on this. The argument that while it's before the Ninth Circuit really only gets you an extension until January 9th, 2006, right? I mean, January 9th, 2004. I'm sorry. That's when the mandate issues from the denial of rehearing and bond. That's correct, Your Honor. But there was already at that point in time. There was a motion for deferred. Yeah. Well, let me walk through it. Okay. So you need that also to toll it, right? Correct. And there's no authority on that, right? There are two cases, Your Honor. The Supreme Court in A.D.C. said that a request for deferred action is a request for a stay of removal. Specifically, the Supreme Court said that. And this Court in Desta said that a request for a stay of removal is a request for a stay of the voluntary departure period. So that would mean under A.D.C. and Desta, the voluntary departure period was stayed prior to the mandate being issuing. And I'll say the one minute I have. What were those two cases? The American Arab Anti-Discrimination Committee, which is a Supreme Court case. Anti-Arab case? Is that what you're saying? The American Arab Anti-Discrimination Committee. And that's cited in a brief Supreme Court case in 1999, I believe. And the Desta decision from this circuit, which came down in 2004, 365 F. 3rd, 741, which says that the request for a stay of removal is a request for a stay of voluntary departure. But if it's a request for a stay, does it still have to be granted? No, but this Court has held in Desta and then Azarte that once you make that request, that automatically stops the period from running. So it hasn't run as of the time that the request for deferred action was made under A.D.C. and Desta. And I'll save the one minute I have. Thank you. Ms. Drucker. Good morning, Your Honors. May it please the Court. My name is Allison Drucker. I'm here representing the United States. The petitioner is now before this Court for the second time. After entering illegally, he was put in proceedings, found removable by an immigration judge, then by the Board, then by this Court. In May of 2004, he filed a motion to reopen five years after initially he was granted voluntary departure. The thing that I think gets me the most in this case is they have this labor certification process, right? But all the people who applied for it in 2000, if they were in deportation proceedings, they could never get it because of the backlog. Isn't that correct? They'd never get the benefit of it because of the backlog. I don't know that they would never get any. Apparently there was a problem that affected a lot of cases. We don't know. There's nothing in the record that indicates whether it affected this particular one or not. Well, it took almost three years, a month short of three years, I think, for him to get his labor certification approved. And then he can't do anything with it because, one way or the other, he can't come back for 10 years. He can't apply for adjustment of status for 10 years, either because he overstayed his voluntary return or because he'd been in the country for more than a year illegally. Right? Well, that's true, Your Honor. But, you know, I mean, originally he was supposed to be departing in 1999, and he didn't even start this labor certification process for some time after he'd already agreed to depart. But all that would have been stayed pending appeal to the Ninth Circuit or review and to the BIA, right? The voluntary departure. That's correct. But so hasn't Congress then created a system of offering these benefits that people who are in his situation can never get? Well, it's not that they can never get. I mean, they don't have to. First of all, they don't have to accept voluntary departure. They don't have to, you know, ask it or take it if they don't want it. But then he'd be deported, right?  He can't come back now. He can't apply to come back for 10 years because he was here more than a year. He could leave voluntarily before that happens. But then he'd be back in Mexico, and you'd say he can't come back for 10 years. Not if he wasn't on order of voluntary departure. But then you'd say, well, he overstayed his voluntary departure order. He's still here in the United States. So what it does is it creates this sort of anomalous situation where people who have these labor certifications ultimately granted, but it takes three years to get it and have been here for more than a year, and it was designed to help them, it can't possibly help them. I'm afraid that this ‑‑ there's lines of people waiting all over the world for various, you know, visas to come into the United States. Some of them wait patiently in their home countries, and some come here illegally, like this petitioner did, and then they're sort of taking their chances, you know. But they changed the statute and extended the statute to apply for people who are here illegally. I mean, the whole ‑‑ the statute was designed to cover just this situation, but by not allowing a motion for reopening, he can't get the benefit of the situation. It's the true catch-22, isn't it? At least for him. At this point, he's in, I guess, a difficult spot, but that's, you know ‑‑ the law is not always, you know, perfect and doesn't always work out consistently in all respects, but it still needs to be followed and it needs to be enforced by this Court as well. I'd like to return to the ‑‑ Ms. Rucker, let me ask you a totally different question. I know that the government has expressed interest and willingness to mediate a number of immigration cases where there are no apparent external problems. Not to put too fine a point on it, but people who have lived here, worked here, have stayed out of trouble, whatever. Is there any interest in this case in participating in the mediation process? I'm not aware of any discussions that have gone on prior to this time about that. I was only involved in this case when it was assigned to me for oral argument. Well, I'm not concerned about whether there have been from up until now. My question has to do with, as of right this minute, whether it wouldn't be of mutual interest to sit down under the auspices of our mediation service and see if there couldn't be a resolution of a case which, from all appearances, I mean, I'm not expressing an opinion on what the outcome of this appeal will be, but putting aside legal niceties, it seems to me as if the government might have an interest in serving the interests of justice by sitting down and seeing if something couldn't be worked out. I don't choose to take that path at this time, Your Honor. I'm sorry? I don't choose to take that path at this time, Your Honor. Are you speaking with authority from the United States government for that position? I would have to check back with my line of supervision to speak with authority. But you're asking me to tell you something else, and so that's what I'm telling you. I have seen a number of cases recently where it's happened, including one two weeks ago, two cases two weeks ago, where the Department of Justice itself expressed serious interest in mediating cases of this nature. And they could defer. Even now they could, if they wanted to, defer under the CFR's deportation, right? And you always have the power to do that. That's a possibility. There was a similar situation, and I may have mispronounced the case, Arzate or Azarte. And that was where you had the situation where the person is being removed and therefore couldn't pursue the motion to reopen because the motion to reopen wasn't decided within the 90-day period. And this Court said that even though you have two laws there, that the way they work together creates an unfairness. And so they deemed that under those circumstances that there would be a stay, right? Yes, Your Honor. So why wouldn't that be a similar circumstance? Although it might be a broad stroke, why shouldn't we do that here? Well, are you talking about the deferred action that Petitioner requested? I'm talking about the labor certification. See, I come back to the situation about the government giveth with one hand and taketh away with the other. And obviously Congress didn't intend to do that. And so Congress didn't intend that it would take so long. And so if it just takes so long because there are just so many of these, shouldn't there be some kind of relief? And I don't know that this would apply to very many cases in the future because this is kind of an anomalous situation. In our view, the Azarte decision and its rather novel rationale is cabin to motions to reopen and not to these other situations. And over and over, the decision in Azarte stresses that its rationale is to give effect to congressional intent by making two statutory provisions compatible, namely those about voluntary departure and those about tolling. And let me, let's see, I have some quotes from the statute here that emphasize that aspect. The only question is how these two provisions interact. We confront two new statutory provisions both created by ARERA. The statutory interpretation of a motion to reopen and voluntary departure provisions must be such that both provisions have force. We don't think that Azarte applies to labor certifications or to deferred action situations and shouldn't be extended to those. Well, why shouldn't it in this case be extended to this very unique situation where you have a person who, if there is no stay, cannot get the benefit of the labor certification that the government is taking so long to give? Because those have to do with mechanisms that did not fall within this decision, did not fall within the statutory provisions of the INA. I would like to have at least a moment, there's very little of my time left, to address the fact that there was a totally, you know, additional reason for the board's denial in this case. And I haven't had an opportunity to address that at all. Well, we've read the briefs. And I think the far more important thing is that you communicate back to the Department of Justice they should not send a representative out here without authority to deal the case. And I – it's certainly my impression, speaking for myself, that that was now the policy of the Department. So I think that's something that you might want to discuss when you get back to Washington. Mr. Pandego, do you have anything to add? Thank you, Your Honor. I think, Judge Moskowitz, you've identified the catch-22 we've been trying to express in our briefing here. As to the change, the government did change, but too late for a Respondent. They now have put in place, and they recognize, and we cited this in our briefing on page 51 of our opening brief, their regulations, which now, too late for a Respondent, but came in in July of 2004, have this new process where it takes 60 days to do the labor certification. And they recognize that they were taking far too long, and they changed it. So this is the one where they sent them to a central location? Correct.  They recognize it. They corrected their process, et cetera. And lastly, I would say it's a guide case to the Court. We did that in our 28J. It's 405 F3rd 1040. And as to mediation, we are totally open to that. And if the Court – I will say that we will pursue that with the Court, and if the Court wants, we'll advise the Court as to what process is made, if any, on the mediation if the Court would like us to. Okay. Anything else? Thank you for your argument, counsel. The matter just argued will be submitted and the Court will stand adjourned. Recession. All rise. Recession.
judges: Leavy, Rymer, Moskowitz